UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| STEMTECH INTERNATIONAL INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:16-cv-918-RP |
| | § | |
| CHRISTIAN DRAPEAU, GREG NEWMAN, | § | |
| CERULE, LLC, BIOMICS LLC, and | § | |
| GEORGE TASHJIAN, | § | |
| | § | |
| Defendants. | § | |
| | § | |

**ORDER**

Before the Court is Plaintiff Stemtech International, Inc.'s Application for Preliminary

Injunction. (Dkt. 29). For the reasons that follow, the Court finds that Plaintiff's Application should

be denied.

**BACKGROUND**

**I.      The Players**

Plaintiff Stemtech International, Inc. ("Stemtech") is a Delaware corporation with its

principal place of business in Pembroke Pines, Florida. Stemtech was formed in 2005 by Ray Carter,

now CEO of Stemtech, and Defendants Greg Newman ("Newman") and Christian Drapeau

("Drapeau"). Stemtech was initially formed to serve as a marketing partner for Defendant Cerule

LLC ("Cerule")[1] to market Cerule's stem cell nutrition product, StemEnhance. Stemtech has grown

over the years to market a variety of stem cell nutrition products worldwide.

Cerule is an Oregon corporation with its principal place of business near Klamath Falls,

Oregon. It harvests algae known as Aphanizomenon flos-aquae ("AFA") and manufactures the AFA

---

[1] Cerule was known as Desert Lake Technologies, LLC at the time. To avoid confusion, the Court
refers to the entities as they are known now.

extracts which make up its StemEnhance product. Cerule was Stemtech's sole source of StemEnhance and was a key Stemtech supplier between 2005 and 2016. Cerule recently launched a slate of stem cell nutrition products that compete with Stemtech's.

Drapeau has served as the Chief Science Officer of Cerule since around July 2016. Prior to 2005, he had served as Cerule's Director of Research and Development and was largely responsible for the development of StemEnhance. After co-founding Stemtech, he served as that company's Chief Science Officer and led research efforts and the development of new stem cell nutrition products. His employment contract expired as of July 2015 and he thereafter worked for Stemtech as an independent contractor. Until March 2016, Drapeau also served on Stemtech's board of directors. Drapeau continues to be a major shareholder of Stemtech, with forty-three percent of the company's stock.

Defendant Biomics LLC ("Biomics") is a limited liability company organized under the laws of the State of Texas and is headquartered in Austin, Texas. Drapeau formed Biomics on March 22, 2016, the day before he resigned from Stemtech's board of directors. The Complaint says little about Biomics, other than alleging that it was formed to compete with Stemtech and that it has trademarked "Mesenkine" for use with an ingredient used in Cerule's competing products and "StemAloe" for use with an additional stem cell nutrition product.

Newman is the CEO of Cerule. He is another co-founder of Stemtech, along with Drapeau and Ray Carter, with Carter being the majority shareholder (50.2%) and CEO of Stemtech. He is a resident of Klamath Falls, Oregon.

Defendant George Tashjian was Stemtech's Director of IT. In July 2016, Tashjian left Stemtech for Cerule. The Application for Preliminary Injunction says almost nothing about him, and the proposed order does not mention him at all. Stemtech's Reply in support of its Application for

Preliminary Injunction suggests that the injunction is sought against Drapeau and Cerule only. (Reply, Dkt. 54, at 5 n.3). Tashjian is a resident of San Clemente, California.

## II.  The Scene

In 2005, Stemtech was founded by Carter, Drapeau, and Newman. Drapeau and Newman were then affiliated with Cerule as the Director of Research and Development and CEO, respectively. Stemtech was originally envisioned as a company that would market StemEnhance, Cerule's algae extract that purportedly supports adult stem cell function. Originally based in Oregon, Carter decided to move the company to Orange County, California, in 2006. Stemtech takes the form of a multi-level marketing business, known colloquially as "pyramid schemes." Independent contractors—or "Independent Business Partners," as Stemtech calls them—promote and sell Stemtech's products in exchange for commission and perhaps other compensation. Stemtech also incentivizes each distributor to build "downlines" by sponsoring new Independent Business Partners in order to grow the business. Stemtech now has about 30,000 distributors worldwide.

Early on, Stemtech and Cerule entered into a Manufacturing, License, and Supply Agreement (the "License Agreement"), under which Cerule agreed not to sell or market StemEnhance to anyone but Stemtech. Cerule further agreed that Stemtech's marketing concepts, customer lists, and lists of distributors would be intellectual property belonging to Stemtech. As part of the agreement, Stemtech paid Cerule a licensing fee of $1.5 million. Until recently, Cerule's sales of StemEnhance to Stemtech constituted 70% of Cerule's revenue.

Since Stemtech's inception, Ray Carter has served as the corporation's CEO. He also serves on its board of directors and is, at least now, the owner of 50.2% of its stock. Drapeau also joined Stemtech as an employee at some time and served as its Chief Science Officer. Over the course of his employment, Drapeau led Stemtech in developing and launching a variety of stem cell nutrition products.

Drapeau signed several agreements with the Company while at Stemtech. Of those produced in this litigation, the first is a Stockholder Agreement, dated June 2007. It outlines certain rights and restrictions with respect to the parties' shares in the company. The Stockholder Agreement was amended one month later by a Buy Sell Agreement. This latter agreement imposed restrictions on the transfer of shares by shareholders and granted rights of first refusal to the company and the non-transferring shareholder. It also included non-compete and non-disparagement clauses that remain in effect until one year after Drapeau sells his shares. In May 2011, Drapeau signed an Employee Proprietary Information and Inventions Agreement (the "Inventions Agreement"). It included a non-disclosure clause and an agreement that Drapeau would assign all inventions made during his employment to Stemtech. It also included an agreement that Drapeau would return all company devices to the company when he left his employment.

The final two agreements are an Executive Employment Agreement and an Amended Buy Sell Agreement, both dated July 1, 2012.[2] The Executive Employment Agreement outlined Drapeau's responsibilities and compensation. It included non-compete and non-disparagement clauses that remained in effect until one year after the expiration of the contract. It also included an arbitration clause. The Amended Buy Sell Agreement had many of the same covenants as the prior Buy Sell Agreement, including the non-compete and non-disparagement clauses, though it made further arrangements related to the rights of the parties' spouses. The Amended Agreement provided that it replaced the June 2007 Stockholder Agreement in its entirety.

## III.   The Drama

The relationship between Carter and Drapeau, the two driving forces behind Stemtech, was strained from very early on. The acrimony first began with Carter's decision to relocate Stemtech

---

[2] The parties presented evidence at an evidentiary hearing suggesting that the agreements were not in fact executed on July 1, 2012. The Court finds it unnecessary to make explicit findings as to when each was in fact signed.

from Oregon to California. It appears to be motivated in large part by Drapeau's disagreements with Carter's management style and Drapeau's feeling that Carter—the majority shareholder, CEO, and one-third of the board of directors—would not take his opinion into account when making major corporate decisions. The tension was only exacerbated by Stemtech's financial difficulties, which began around 2012. Carter asserted in his deposition that the problems were caused by Cerule's failure to produce enough StemEnhance for Stemtech to fulfill all of its orders. Stemtech negotiated a payment agreement with Howard Newman, then CEO of Cerule and father of Defendant Greg Newman. However, this agreement was rescinded in 2014 and led to Stemtech again falling behind in making payments to Cerule.

By 2015, it seemed clear that Drapeau was on his way out at Stemtech. He allowed his employment contract to expire in July 2015, after which time he states that he assumed independent contractor status.[3] Efforts to draft a new agreement, which was to include a modified non-compete clause, failed.[4]  Drapeau stated in his deposition that he began making plans to leave Stemtech and form a competing company in 2015. Aware of his non-compete clause, which purported to be active for a year following the expiration of his employment agreement, he decided to continue working for Stemtech until the end of June 2016. News that Drapeau was planning to exit the company and form a competing company began reaching Carter in 2016. Carter alleges that he heard from certain independent distributors that they had been approached by certain Stemtech executives who hinted at their intention to follow Drapeau to a new company. Stemtech alleges that these executives impliedly solicited the distributors to join them. According to Stemtech, the executives would also

---

[3] Stemtech maintains that Drapeau was still an employee of Stemtech at this time. It produced evidence that Drapeau was still classified as an employee for tax purposes. Putting aside whether Drapeau was an employee as a matter of law, Stemtech did not argue that his employment contract remained in effect after July 2015.
[4] Stemtech pointed to an email exchange between Drapeau and Carter in which the two discussed a non-compete provision that was to be included in a new contract. It has not been shown that a valid and enforceable contract has resulted from this exchange.

disclose that Stemtech had been cut off by key suppliers for failure to pay for goods, was in default on its loans, and owed other money to a judgment creditor.

In March 2016, Drapeau announced his resignation and offered to stay at Stemtech until July 1, 2016. Carter decided that it would be harmful to the company to have Drapeau continue to work until July and decided that Drapeau would work only through March. Drapeau apparently retained his company laptop after leaving. He asserted that he kept the computer so that Stemtech would return personal items he left in his office and reimburse him for around $4,000 in company expenses. According to Stemtech, the laptop is a treasure trove of trade secrets, but Drapeau insists he has accessed it only once to delete personal financial information. At the hearing on Plaintiff's Application, Drapeau gave the computer to Stemtech in exchange for a check.

Around the time of Drapeau's departure, Cerule provided Stemtech with a notice that it would cancel the License Agreement if Stemtech did not cure its default in payment within 90 days. In May 2016, Carter sent Cerule a letter indicating that it would no longer use Cerule's StemEnhance in its products and would not pay Cerule the amount owed. Cerule then sued Stemtech in Oregon for breach of contract that same month and ultimately terminated the License Agreement in June.[5]

Since leaving Stemtech, Drapeau formed his company, Biomics LLC, in June 2016. He insists is only a vehicle for his consulting activities and only markets products in the Middle East, where Stemtech has no operations. He has also trademarked the term "Mesenkine" for use with a stem cell nutrition ingredient and licensed the term to Cerule for use with a product that competes with Stemtech's. He began association with Cerule to develop a line of products that would replace the revenue lost from Stemtech's decision to drop StemEnhance from their products. This meant, of course, that both Stemtech's products and Cerule's products would compete in the stem cell nutrition market. Drapeau would also host conference calls and presentations promoting Cerule's

---

[5] *See Cerule v. Stemtech*, No. 1:16-cv-873 (D. Or. 2016).

new products. When doing so, Drapeau would allegedly state that Stemtech's products are no longer effective without StemEnhance and that Stemtech was being poorly managed and might not be around much longer. Allegedly due to these activities and other solicitation on Drapeau's part, executives and distributors began leaving Stemtech for Cerule.

Aside from the loss of distributors and other employees, Stemtech alleges that the activities of Cerule and Drapeau have caused it a host of other problems. For example, Stemtech alleges that the Defendants have solicited Stemtech's suppliers to stop doing business with it. However, Carter testified in his deposition that Stemtech had been cut off from some of these suppliers for failure to make payments. Stemtech alleges that Cerule and Drapeau are responsible for its bank raising the interest rates on Stemtech's loans. However, Carter's deposition testimony reveals that the higher rate was part of a renegotiation that Stemtech requested because it could not make its loan payments. Stemtech also blames the Defendants for its credit card processor's placing a hold on Stemtech's credit card income until it built up a $300,000 reserve. At his deposition, Carter acknowledged that the lawyer for a $1.6 million judgment creditor contacted its processor and informed them of the judgment. He is certain, though, that someone associated with Defendants must have revealed the identity of the processor to the lawyer. These allegations form the basis of Stemtech's tortious interference claims.

## IV.     The Cast Party

Stemtech filed this lawsuit on July 27, 2016. It filed an emergency application for a temporary restraining order on September 1, 2016. This Court denied the application because Stemtech had shown neither a likelihood of success on the merits nor irreparable injury, and had not complied with the notice certification requirements of Federal Rule of Civil Procedure 65. (See Dkt. 11). Stemtech now moves for a preliminary injunction.

Though the Second Amended Complaint asserts twelve claims against the Defendants, only three form the basis of Stemtech's Application for Preliminary Injunction.[6] These are (1) breach of contract; (2) misappropriation of trade secrets; and (3) tortious interference with contract.

## LEGAL STANDARD

A preliminary injunction is an extraordinary remedy and the decision to grant a preliminary injunction is to be treated as the exception rather than the rule. *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The party seeking injunctive relief must "carr[y] the burden of persuasion on all four requirements." *PCI Transp. Inc. v. Western R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005). "However, even when a movant established each of the four requirements described above, the decision whether to grant or deny a preliminary injunction remains within the Court's discretion[.]" *Sirius Comput. Sols. v. Sparks*, 138 F. Supp. 3d 821, 836 (W.D. Tex. 2015).

## DISCUSSION

### I.     Breach of Contract

There are two parts to Stemtech's breach of contract claim against Drapeau: (1) competition and (2) non-disclosure.[7]

---

[6] Stemtech's Application for Preliminary Injunction also urged claims under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. However, these claims were not discussed at the hearing on Plaintiff's Application, and the court understands them to be resolved by Drapeau's return of Stemtech's computer, at least as far as they concern preliminary injunctive relief. Accordingly, the Court does not address those claims here.

[7] Originally, Stemtech pressed claims for breach of contract on the basis of Drapeau's failure to get permission to publish an article and assign an invention to Stemtech as well as his failure to return Stemtech property after ending his employment. Stemtech indicated that it was withdrawing its

A.      Competition

Stemtech argues that Drapeau's competitive activity is a breach of the non-competition clause in the Amended Buy Sell Agreement he signed in 2012 (the "Buy Sell Agreement"). That agreement provides that:

> Each Stockholder agrees that so long as this Agreement shall remain in effect and for a period of one (1) year following any termination of this Agreement [by agreement, transfer of shares, dissolution of the company, or simultaneous death of the stockholders], such Stockholder shall not either directly or indirectly, and will not permit any entity which is controlled by such Stockholder to either directly or indirectly, participate in, assist, aid or advise in any way, any competitive business or enterprise that competes with [Stemtech's stem cell nutritional products] in [any country in which Stemtech receives revenues from the sale of such products].

(Buy Sell Agreement, Dkt. 29-6, at 9). Stemtech alleges that Drapeau has violated this contract through his trademarking names for stem cell nutrition ingredients following his departure from Stemtech and by working with Cerule to develop stem cell nutrition products.

Drapeau remains a Stemtech stockholder and does not argue that the Buy Sell Agreement is no longer in effect. He also acknowledges that the products he develops for Cerule compete with Stemtech's products in relevant markets. However, he argues that the Buy Sell Agreement is governed by California law, which generally holds non-competition clauses invalid. *See* Cal. Bus. & Prof. Code § 16600 ("Every contract by which anyone is restrained from engaging in a lawful profession, trade or business of any kind is to that extent void."). As this argument is disputed by Stemtech, it is necessary to analyze which state's law governs the Buy Sell Agreement.

1.      Governing Law

A federal court sitting in diversity determines the applicable law through use of the forum's choice of law rules. *Benchmark Elec., Inc. v. JM Huber Corp.*, 343 F.3d 719, 726 (5th Cir. 2003). "Under Texas choice-of-law rules governing contracts . . . we look to the Restatement (Second) of Conflict

---

arguments concerning publishing and assignment. The Court also understands that Stemtech no longer pursues injunctive relief for the return of the computer.

of Laws." *Sonat Expl. Co. v. Cudd Pressure Control, Inc.*, 271 S.W.3d 228, 231 (Tex. 2008). In the absence of a choice-of-law provisions, "[t]he rights and duties of the parties . . . are determined by the local law of the state which . . . has the most significant relationship to the transaction and the parties under the principles stated in § 6 [of the Restatement]." Restatement (Second) of Conflict of Laws § 188(1).

Section six of the Restatement offers several factors for courts to consider. These include, among others, the relevant policies of the forum state and other interested states and the relative interests of those states in the determination of the particular issue; the protection of justified expectations; the basic policies underlying the particular field of law; and the certainty, predictability and uniformity of results. *Id.* § 6. In evaluating these factors, the court must consider the place of contracting, the place of negotiation of the contract, the place of performance, the location of the subject matter of the contract, and the domicile, residence, nationality, place of incorporation and place of business of the parties. *Id.* § 188(2). Even when the contract contains a choice of law provision, a different state's law may be applied if that state has a more significant relationship to the parties and transaction, a materially greater interest than the resolution of the issue, and applying the chosen law would contravene the fundamental policy of that state. *Chesapeake Operating, Inc. v. Nabors Drilling USA, Inc.*, 84 S.W.3d 163 (Tex. App. 2002).

Defendants provide several facts to support their argument that California law should apply. For example, Stemtech was headquartered in California when the relevant Buy Sell Agreement was executed. It was entered into by Drapeau on behalf of the CJ Drapeau Trust in California in 2012, when Drapeau also lived in California. The Agreement itself references California probate and community property law. It also provides that, should the parties fail to agree on an arbitrator to settle valuation disputes, an arbitrator will be appointed by the presiding judge of the Superior Court for Orange County, California. Stemtech, on the other hand, argues that Delaware law should apply

because it is a Delaware corporation and that the Buy Sell Agreement implicates the relationship and obligations shared among the corporation and its shareholders.[8]

Most of the Restatement factors favor the application of California law. There is no dispute that the contract was negotiated and executed in California. The parties do not discuss the place of performance, but this factor also favors California law. The Buy Sell Agreement imposed obligations respecting the other shareholders and the corporation upon the transfer of shares. As Drapeau, Carter, and Stemtech were all based in California when the agreement was made, performance necessarily implicated California at that time. Further, Stemtech has cited Delaware *cases* that enforce non-compete agreements, but none of these cases evince a Delaware *policy* in favor of enforcing non-competition agreements that might counteract California's "settled public policy in favor of open competition." *See Hill Medical Corp. v. Wycoff*, 86 Cal. App. 4th 895, 900 (Cal. Ct. App. 2001). Even more, while Delaware does enforce agreements against *employees* to protect employers from damages, it is not clear whether Delaware would also enforce such agreements against active corporate *shareholders*.[9]  Unlike employees, shareholders are not agents of the corporation and usually owe no fiduciary duties to the corporation. *Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del. 1987).[10]

---

[8] Alternatively, Stemtech argues for the application of the laws of Florida, where Stemtech is now based, or the laws of Texas, where Drapeau is now domiciled. However, the parties moved to those jurisdictions after the contract was executed, and there is no other evidence that those states had any connection to the transaction. The laws of those states are therefore inapplicable. *Sonat*, 271 S.W.3d at 236 ("[C]ontracts should be governed by the law the parties had in mind when the contract was made . . . .").

[9] Concededly, Drapeau was also an employee when he executed the Buy Sell Agreement. However, his employment agreement contained its own non-compete clause which has by now expired. The only non-compete obligation remaining arises solely from his status as a shareholder.

[10] Stemtech argues that the non-compete is necessary because Drapeau is privy to confidential information about Stemtech by virtue of his status as a shareholder. At the same time, Stemtech has chosen not to exercise its option to repurchase Drapeau's shares, which would prevent him from obtaining confidential information at any shareholder meetings Stemtech might have. (*See* Buy Sell Agreement, Dkt. 29-6, at 6).

11

Certain other factors are more neutral. For example, the ease of application of the governing law does not favor either side, as a Texas court is no more at ease applying California's laws than Delaware's. The expectations of the parties also favor neither side. On the one hand, the Buy Sell Agreement did replace a contract that expressly designated Delaware law to govern it. On the other hand, all relevant parties were located in California at the time of the agreement, Drapeau concurrently signed an Executive Employment Agreement governed by California law, and the Buy Sell Agreement also borrows from California law.[11] Additionally, the parties clearly intended that the Buy Sell Agreement should completely replace the Stockholder Agreement and did not again provide for the application of Delaware law. As most factors point to California and the others are neutral, the Court finds that California law should apply.

Stemtech makes a number of arguments against the application of California law, but none carries the day. For example, Stemtech points out that the Buy Sell Agreement was intended as an amendment and restatement of the Stockholder Agreement Signed in June 2007. That Stockholder Agreement expressly chose Delaware law to govern it. (Stockholder Agreement, Dkt. 54-5, at 18). Stemtech argues that Buy Sell Agreement did not, among the provisions it changed, alter the choice of law provision. This argument fails because, although the Buy Sell Agreement contains no election of governing law, it does provide that it "replaces and amends in its entirety the June StemTech Stockholders Agreement." (Buy Sell Agreement, Dkt. 29-6, at 13) (emphasis added).  This provision clearly nullifies the choice of law provision in the Stockholder Agreement.

---

[11] At the hearing on this matter, Stemtech argued that the provision for California law in one section of the Agreement suggests that the parties did not believe California law governed the whole contract. The Court might agree if the parties had in fact made an election of law to govern the section. The reference at issue here, however, merely specifies how discrete terms should be defined. The defining of discrete terms is not necessarily relevant to the ultimate determination of governing law. For example, a contract defining the term "spouse" by reference to Texas law might tell us whether the term encompasses a common-law husband. It does not tell us whether extrinsic evidence is admissible to show an ambiguity as to the identity of the spouse—a separate question of contract law concerning the same term that could as easily be determined by another state's law.

Next, Stemtech argues that the Buy Sell Agreement, as a restatement of the Stockholder Agreement, concerns the rights and duties of the stockholders amongst themselves and with respect to the corporation. Thus, according to Stemtech, the laws of Delaware, the state of incorporation, should apply. Stemtech relies on *Weber v. PACT XPP Technologies, AG*, to support its argument. 811 F.3d 758 (5th Cir. 2016). That case is distinguishable. The contract at issue there was a German-language contract concerning the compensation of an executive of a German corporation for his performance on the corporation's supervisory board. *Id.* at 772. The contract also contemplated the jurisdiction of German courts to resolve disputes. *Id.* The Court found that the contract implicated important issues of German corporate law and policy and otherwise held that the balance of factors favored Germany. At issue here is a contract negotiated and executed in California, the jurisdiction in which the corporation was headquartered. In contrast to the Stockholder Agreement, which included provisions concerning the voting of shares and irrevocable proxies—which naturally implicate Delaware corporate law—the Buy Sell Agreement concerned only restraints on the transfer of the parties' shares, which are their personal property. It does not, for example, concern the rights and responsibilities share ownership entails vis-à-vis the internal management of the corporation. As the *Weber* court found it important that the contract there was in German and contemplated the jurisdiction of German courts, this Court likewise finds it relevant that the Agreement here references California law and contemplates that the resolution of disputes may involve the California courts. (Buy Sell Agreement, Dkt. 29-6, at 10 ("[I]f the parties cannot agree upon an appraiser, then the appraiser shall be named by an arbitrator designed [sic] by the presiding judge of the Superior Court in Orange County, California.")).

Stemtech also relies on *Askanase v. Fatjo* for its argument that the Buy Sell Agreement concerns internal corporate affairs that should be governed by Delaware law. 130 F.3d 657 (5th Cir. 1997). However, the Court there held that "the place of incorporation does not decide necessarily

which law to apply" and rejected application of Delaware law when the place of incorporation was the only corporation's only tie to Delaware. *Id.* at 670. Like the corporation in *Askanase*, Stemtech's place of incorporation is its only apparent tie to Delaware.

Finally, Stemtech argues that Delaware law should apply because the parties intended to be bound by the non-compete agreement. But the case Stemtech cites for this proposition, *Cardoni v. Prosperity Bank*, recognizes that even the parties' express designation of governing law can be overcome on grounds of the public policy of the state with a greater relationship to the transaction. 805 F.3d 573, 580 (5th Cir. 2015) (citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex. 1990) ("[The parties] cannot by agreement thwart or offend the public policy of the state the law of which ought otherwise to apply."). If public policy can overcome an *express* choice of law, it follows *a fortiori* that it can overcome an *implied* choice divined from the parties' mere expectation that a provision offensive to that policy will nonetheless be binding. After all, what good is public policy if the parties may escape it simply by intending to do so?

As the Court has found that California law governs the Buy Sell Agreement, the next inquiry is whether the non-compete agreement is the valid under that law.

## 2.      Validity of the Non-Compete Agreement

California law is largely hostile to non-compete agreements. Indeed, they are voided by statute. *See* Cal. Bus. & Prof. Code § 16600. Many other jurisdictions in the country evolved toward a "rule of reasonableness"—enforcing non-compete clauses so long as they are reasonably limited in scope and duration—but California has explicitly rejected that approach. *Hill Med. Corp.*, 86 Cal. App. 4th at 901. Nonetheless, Stemtech argues that there are two bases for enforcement of the non-compete clause despite California's prohibition. First, Stemtech argues that the covenant in the Stockholder Agreement falls within a statutory exception concerning the sale of an ownership

interest in a business. Second, Stemtech argues that California courts enforce non-compete clauses to the extent necessary to protect trade secrets.

Stemtech suggests in a footnote that section 16601 of the California Business and Professions Code applies to the Stockholder Agreement's covenant not to compete and makes it enforceable. That section provides that "[a]ny person . . . selling or otherwise disposing of all of his or her ownership interest in [a] business entity . . . may agree with the buyer to refrain from carrying on a similar business[.]" Cal. Bus. & Prof. Code § 16601. The plain language of the statute applies where (1) a sale of a business interest takes place and (2) the non-compete agreement is made with the buyer of the business interest. *Id.* It is inapplicable to our situation because (1) Drapeau has not sold his shares and (2) the agreement is made not with the buyer of the shares, but with the other major shareholder and the corporation.

It is ostensibly unusual to impose greater obligations on someone who no longer has anything to do with the company than on one who still retains his shares. However, this makes sense when the policy underlying the statutory exception is considered. The statute recognizes that it would be "'unfair' for the seller to engage in competition which diminishes the value of the asset he [or she] sold." *Hill Med. Corp.*, 86 Cal. App. 4th at 902 (quoting *Monogram Indus., Inc. v. Sar Indus., Inc.*, 64 Cal. App. 4th 692 (Cal. Ct. App. 1976)). It thus protects buyers of stock from purchasing a business interest at an inflated price that assumes a lack of competition, only to have the seller diminish the asset by opening a competing business. The statute also recognizes that sellers of stock may not be able to get a fair price if the law would not allow them to agree not to compete, as buyers may factor the risk of future competition into the price. *See id.* These fairness concerns simply have no bearing on situations where, as here, a current stockholder undertakes competing activity. As the competition is open and ongoing, any sale of stock will necessarily take into account the

seller's competition. Further, the seller voluntarily bears any loss that his competition causes to his own investment.

It bears mentioning, too, that Drapeau's sale of his stock to Stemtech would not automatically make the non-compete enforceable. California courts have long read a requirement into the statute that the sale include the company's goodwill. *See, e.g.*, *Bosley Med. Grp. v. Abramson*, 161 Cal. App. 3d 284, 290 (Cal. Ct. App. 1984). And "[s]imply selling shares to an individual vendee or back to the corporation does not necessarily demonstrate that goodwill is part of the agreement." *Hill Med. Corp.*, 86 Cal. App. 4th at 904. Rather, courts must evaluate "all aspects of the sales arrangement," including whether the sales price reflected the anticipated costs of competition to the buyer, or of the inability to compete to the seller. *Id.* This fact-intensive inquiry both suggests that the statutory exception does not apply in the absence of a sale and that the Buy Sell Agreement's non-compete clause would be unenforceable in any case if the sales price of Drapeau's stock reflects his competition—as it likely would given his current open competition.

Stemtech's next argument—that California enforces non-compete agreements as necessary to protect trade secrets—has stronger footing, but still falters. The California Supreme Court recently held that non-competition clauses are invalid unless they fall within a statutory exception. *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 946 (2008). However, the court stated expressly that it was not ruling on the validity of the judicially created trade-secret exception as it was not presented in the case. *Id.* at 946 n.4. Lower courts have since tried to reconcile *Edwards*'s clear holding that only those agreements within a statutory exception are valid with the non-statutory trade-secret exception. Some courts have expressed "doubt [as to] the continued validity of the common law trade secret exception[.]" *see, e.g.*, *Dowell v. Biosense Webster, Inc.*, 179 Cal. App. 4th 564, 578 (Cal. Ct. App. 2009). Others have continued to apply it. *See, e.g.*, *Wanke, Indus., Commercial, Residential, Inc. v. Superior Court*, 309 Cal. App. 4th 1151, 1176–80 (Cal. Ct. App. 2012). Others

recognize the issue as an open question. *See, e.g.*, *Anaqua, Inc. v. Bullard*, 2014 WL 10542986, at *10 n.9 (Mass. Super. July 24, 2014). The leading case, however, explains that, after *Edwards*:

> [S]ection 16600 bars a court from specifically enforcing (by way of injunctive relief) a contractual clause [restraining competition] but a court may enjoin tortious conduct (as violative of the Uniform Trade Secrets Act and/or the Unfair Competition Law) by banning the former employee from using trade secret information to . . . unfairly compete with the former employer. Viewed in this light, therefore, the conduct is enjoinable not because it falls within a judicially-created "exception" to section 16600's ban on contractual [non-compete] clauses, but is instead enjoinable because it is wrongful independent of any contractual undertaking.

*Retirement Grp. v. Galante*, 176 Cal. App. 4th 1226, 1238 (Cal. Ct. App. 2009) (emphasis in original).

*Galante* is persuasive as it is faithful both to the language of section 16600 and to *Edwards*'s holding that restraints must fall within a statutory exception in order to be valid. Following its reasoning, the Buy Sell Agreement's non-compete clause is unenforceable under section 16600 and cannot support an injunction. Rather, Stemtech must show that Drapeau's conduct is independently tortious. *See id.* at 1238.  As will be discussed below, Stemtech does not show that an injunction is necessary to protect its trade secrets.[12]

### B.    Non-disclosure

Stemtech alleges that Drapeau has breached the non-disclosure provision of the Inventions Agreement he signed in May 2011 while employed at Stemtech.

The Inventions Agreement provides that, during his employment and thereafter, Drapeau will not disclose, use, lecture upon or publish any of Stemtech's proprietary information. (Inventions Agreement, Dkt. 29-5, at 2). The agreement defines proprietary information somewhat circularly as "any and all confidential and/or proprietary knowledge, data or information of the Company." (*Id.*). This includes Stemtech's research, formulas, discoveries, trade secrets, and other developments, as

---

[12] Defendants argue that the Buy Sell Agreement was a "sham" intended to circumvent section 16600. They also raise the colorful argument that the Employment Agreement's merger clause superseded the Buy Sell Agreement. As the Court has found the non-compete provision unenforceable on other grounds, it is unnecessary to reach these arguments.

well as business plans and employee compensation. (*Id.*). The agreement also contains the following curious clause: "Notwithstanding the foregoing, it is understood that, at all such times, I am free to use information which is not gained as result [sic] of a breach of this Agreement, and my own skill, knowledge, know-how and experience to whatever extent and in whichever way I wish." (*Id.*).

Stemtech alleges that Drapeau has breached the agreement in numerous ways. In its Application for Preliminary Injunction, Stemtech asserts that Drapeau is using its confidential distributor and supplier lists, and that Drapeau is using his knowledge of its products' formulations to create competing products. In its Reply, Stemtech elaborates that Drapeau is also using information concerning Stemtech's business model, including its network of distributors, vendors, and the location of its most successful markets. Additionally, Stemtech asserts, Drapeau is using his knowledge of Stemtech's top distributors to lure them away to join Cerule. Finally, Stemtech explains that while Cerule's competing products feature different formulations and ingredients, Drapeau nonetheless wrongfully used Stemtech's know-how to avoid lengthy research and trial-and-error processes when formulating the new products. Drapeau responds simply that he has used no information that has not been publicly disclosed.

Unlike the Buy Sell Agreement, the Inventions Agreement expressly designates that California law applies. The non-disclosure provision therefore runs into immediate trouble as such agreements fall within the scope of section 16600 of the California Business and Professions Code to the extent they restrain competition. *See Metro Traffic Control, Inc. v. Shadow Traffic Network*, 22 Cal. App. 4th 853 (Cal. Ct. App. 1994) (invalidating a non-disclosure agreement as void under section 16600). For the reasons stated previously, it is unlikely that this provision can support an injunction that is not independently supported by the Uniform Trade Secrets Act. *See id.* at 861 (""[An] employer will be able to restrain by contract only that conduct of the former employee that would

have been subject to judicial restraint under the law of unfair competition, absent the contract.'");

*Galante*, 176 Cal. App. 4th at 1238.

As for those applications of the non-disclosure agreement that may not be anticompetitive, there is a second problem. That is, an odd clause exempts all information not obtained as a result of a breach of the agreement, as well as Drapeau's own knowledge, skill, and know-how—terms left undefined in the agreement. The clause is puzzling because the only information that would be obtained as a result of a breach would be that which has been improperly disclosed or used. This puts all information *not disclosed* within the realm of information the clause allows Drapeau to use freely. Further, the experience Drapeau gains while employed becomes his knowledge, skill, and know-how, and the Inventions Agreement provides no guidance on how to differentiate what know-how is Drapeau's and what is Stemtech's. Attempting to make sense of the clause, it could be surmised that the intent was to allow Drapeau to use any information that Stemtech has authorized to be disclosed and the know-how he possessed prior to joining Stemtech. *See Roden v. AmerisourceBergen Corp.*, 186 Cal. App. 4th 620, 651 (Cal. Ct. App. 2010) ("[Courts] must interpret a contract in a manner that is reasonable and does not lead to an absurd result.").

Even read this way, Stemtech's claims on the non-disclosure clause are weak. As for Stemtech's allegations that Drapeau is soliciting its distributors, Drapeau has produced a printout from Stemtech's website listing the names and information of the only two distributors alleged to have been solicited directly by Drapeau. (Stemtech Printout, Dkt. 31-3, at 2).[13]  Stemtech has also put forward no evidence that Drapeau has disclosed or used any supplier "list," and Drapeau insists

---

[13] As Drapeau has pointed out, as a business that relies on independent business distributors, Stemtech necessarily relies on individuals publicly identifying themselves as Stemtech distributors in order to market its products. While distributor "lists" may be confidential, the identities of discrete distributors—including those alleged to have been solicited—cannot possibly be confidential as a matter of common sense. (*See* Drapeau Dep., Dkt. 49-4, 63:19-22 ("So a company can consider that list secret to them, but these are not secret people, they're people that promote themselves, advertise themselves and make it known that they are part of a business.")).

that the suppliers advertise themselves, can be found with a Google search, and that he has released

a video (presumably while at Stemtech) disclosing the identity of the Stemtech aloe supplier at issue

here. (Drapeau Dep., Dkt. 49-9, 67:3–68:7). As for Stemtech's product formulations, Drapeau points

out that Stemtech must disclose its product formulations—including ingredients and their

concentrations—to foreign governments, and that these disclosures are publicly available. (*See*

Government of Canada Webpage, Dkt. 41-2, at 2). Given the ready availability of this information,

the formulations may fall within the Inventions Agreement's clause allowing the use of information

obtained by means other than a breach of the nondisclosure agreement.[14]

The nondisclosure agreement is likely invalid under California law to the extent it restrains

Drapeau's competition. As for whatever applications the agreement has that are not anti-

competitive, Stemtech has not shown that any of the information Drapeau allegedly used was not

previously disclosed and thus within the exception clause of the Inventions Agreement. Accordingly,

Stemtech fails to show a likelihood of success on the merits of this breach of contract claim.

## II.      Misappropriation of Trade Secrets

Under Texas law,[15] a plaintiff establishes a claim for misappropriation of trade secrets by

showing that: "(1) a trade secret existed; (2) the trade secret was acquired through a breach of a

confidential relationship or was discovered by improper means; (3) the defendant used the trade

---

[14] Pointing to *Sirius Computer Solution, Inc. v. Sparks*, 138 F. Supp. 3d 821 (W.D. Tex. 2015), Stemtech appears to argue that an injunction is warranted simply because Drapeau possesses other confidential information that he *might* use against Stemtech. The holding to that effect in *Sirius* was based in part on the court's finding that the non-disclosure provision was essentially an agreement not to compete enforceable under Texas law. *Id.* at 136. As explained above, the enforceability of the non-disclosure provision is doubtful under California law, which governs the non-disclosure clause. Further, California law does not recognize the "inevitable disclosure" doctrine that permits an injunction based on the mere risk of disclosure. *Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1458–65 (Cal. Ct. App. 2002).

[15] All relevant states have enacted the Uniform Trade Secrets Act, but the parties do not specify which state's trade secret jurisprudence should govern. Stemtech cites Texas law exclusively, and Defendants cite to both California and Texas law. As the bulk of allegations concern Drapeau's competing activities, which he presumably conducts largely in Texas, Texas law appears to be appropriate.

secret without the plaintiff's authorization; and (4) the plaintiff suffered damages as a result." *Tex.*

*Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 366–67 (Tex. App.

2009). A trade secret is any "information, . . . device, method, technique, process, financial data, or

list of actual or potential customers or suppliers, that: [] derives independent economic value . . .

from not being generally known to, and not being readily ascertainable by proper means by, other

persons . . . and is the subject of efforts that are reasonable under the circumstances to maintain its

secrecy." Tex. Civ. Prac. & Rem. Code § 134A.002(6).

Stemtech's trade secret allegations are a bit murky. Between the Complaint and its briefing, it

is unclear what exactly Stemtech claims as a trade secret, why the information constitutes a trade

secret, what facts demonstrate Defendants' use of those secrets, and what damages Stemtech has

suffered as a result. The Court understands Stemtech's principal allegations to be as follows:

(1) Defendants are using Stemtech's confidential distributor list to target Stemtech's distributors and

employees to join Cerule in competing with Stemtech; (2) Defendants are using Stemtech's

confidential supplier list to contact suppliers in an effort to interfere with Stemtech's contracts with

those suppliers and to obtain ingredients for Cerule's competing products; (3) Drapeau has used his

knowledge of Stemtech's secret product formulas to create competing products for Cerule; (4) that

Drapeau is using his knowledge of Stemtech's business structure and marketing strategy to organize

Cerule's business. Though damages are addressed somewhat obliquely in Stemtech's arguments

concerning trade secrets, it could be synthesized from its briefing that the Defendants' actions have

eroded Stemtech's competitive advantage and harmed Stemtech's relationships with distributors and

suppliers.

As Defendants point out, Stemtech does not establish that much of the relevant information

warrants trade secret protection. For example, while a confidential distributor list could warrant

protection, Stemtech has not produced any evidence—other than speculation—that Drapeau has

access to a distributor "list," or that he has used such a list to contact employees. (See Drapeau

Dep., Dkt. 49-4, at 66:19-24 (denying that he has access to a list of distributors)). To the extent

Stemtech has produced evidence that Drapeau solicited distributors, the evidence concerns only

distributors whose identities had been released publicly by Stemtech. (Stemtech Printout, Dkt. 31-3,

at 2).

The same is true of Stemtech's suppliers. Stemtech's allegations focus on Drapeau's alleged

contact with two suppliers in Madagascar and China. In July 2016, Drapeau allegedly contacted the

Madagascar supplier to inform it that Stemtech owed money to several creditors and that it was

poorly run. (Second Am. Compl. ("SAC") § 28). On the other hand, Drapeau asserts that the

Madagascar supplier called him out of the blue to vent about Stemtech, including about not

receiving timely payment, during the course of which conversation Drapeau blamed Carter for

mismanagement and Stemtech's debts for the non-payment of the Madagascar distributor. (Drapeau

Dep., Dkt. 49-4, 106:3-16). The parties provide similarly conflicting stories about the Chinese

supplier. Stemtech asserts that Drapeau traveled to China to meet with its supplier, while Drapeau

denies having ever been to China. (Id. 111:16). He does, however, acknowledge briefly discussing

Stemtech's financial problems after a representative from the Chinese distributor approached him at

an event in Las Vegas. (Id. 111:5-13). Even crediting Stemtech's version of events, there has been no

showing that these suppliers are confidential. Stemtech concedes that "one or two key suppliers may

be touted to a larger group." (SAC § 28); see Zeocon Indus. v. Am. Stockman Tag Co., 713 F.2d 1174,

1178 (5th Cir. 1983) (noting that not all employment relationships are confidential such that

disclosed information would constitute a trade secret). Drapeau has claimed that he released a video

identifying the Madagascar supplier, presumably on behalf of Stemtech, and that Cerule in any case

does not use the Chinese supplier for any of its products. While the statements may be relevant to a

non-disparagement agreement, they do not establish that either Drapeau or Cerule misappropriated trade secrets, and certainly do not show that Stemtech was thereby damaged.

Stemtech's allegations regarding its product formulations are perhaps the weakest. It is indisputable that the exact ingredients and concentrations of Stemtech's products are available to anyone with an internet connection. (*See* Government of Canada Webpage, Dkt. 41-2, at 2). "Texas requires that a trade secret be 'secret', i.e., that it be neither generally known by others in the same business nor readily ascertainable by an independent investigation." *A.M. Castle & Co. v. Byrne*, 123 F. Supp. 3d 895, 901–02 (S.D. Tex. 2015) (citing *Carson Prods. Co. v. Califano*, 594 F.2d 453, 461 (5th Cir. 1979) ("However strong may be . . . the other indicia of trade secret status, it is elemental that . . . [it] must be secret.")). The public availability of these formulas makes them ineligible for trade secret protection. *See id.* This is true even when disclosure is made pursuant to government regulations, at least where the persons to whom the information is disclosed are under no obligation to keep it confidential. *See Polar Molecular Corp. v. Amway Corp.*, 1:07-CV-460, 2008 WL 907472 (W.D. Mich. Mar. 31, 2008) (holding that information disclosed to third party pursuant to federal regulations was not a trade secret where disclosure was not accompanied by a confidentiality designation).[16]

It is also the case that the two products primarily at issue—Cerule's PlasmaFlo and StemEnhance Ultra—feature formulations that differ from Stemtech's products. According to Defendants, PlasmaFlo and Stemtech's StemFlo share only two ingredients (lemon extract and cacao) which Cerule obtains from different vendors. The ingredients for Cerule's StemEnhance Ultra are more similar to Stemtech's se3 and StemRelease products. According to Defendants, se3 is

---

[16] Even if foreign disclosure did not waive trade secret protection in the United States, it would still be accessible to Drapeau through means which do not constitute a breach of any non-disclosure agreement. This would bring the information within the clause in the Inventions Agreement allowing Drapeau to use any information he obtains by means other than through a breach of that agreement. (*See* Invention Agreement, Dkt. 29-5, at 2).

a mixture of AFA (StemEnhance), aloe macroclada, and undaria pinnatifida—a source of fucoidan. StemEnhance is Cerule's own product, which was supplied to Stemtech under a License Agreement that is now the subject of litigation in Oregon. Defendants further add that Cerule's StemEnhance Ultra does not contain aloe macroclada, and that the undaria pinnatifida is not a trade secret but rather the subject of a publicly released study by Marinova, an Australian biotechnology company.[17]

Stemtech argues that, notwithstanding the different formulations, Drapeau and Cerule have been able to develop and market products within a matter of mere months because of the know-how Drapeau developed over his years of research at Stemtech. The evidentiary support for this particular claim of misappropriation is a bit nebulous.[18] Under Texas law, "[a]n employee may use his general knowledge, skill, and experience acquired in the former employment to compete." *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 512 (Tex. App. 2003). The employee may do so "even if the former employment has acted to increase his skills and if such training is complex and extensive." *Reading & Bates Constr. Co. v. O'Donnell*, 627 S.W.2d 239, 243 (Tex. App. 1982). These principles would seem to give Drapeau substantial leeway, particularly given that Stemtech's product formulations have already been publicly disclosed. As it stands now, the record does not show that Drapeau is relying on any undisclosed trade secrets—as opposed to his own knowledge and experience and/or publicly disclosed information—in the development of Cerule's products.

Similarly vague is Stemtech's fourth and final principal allegation of misappropriation. Stemtech alleges that Defendants are using information concerning its business model—including its

---

[17] Stemtech has noted that it filed for patent protection on aloe macroclada and undaria pinnatifida related to stem cell support, and that it holds a patent related to its StemFlo product. "[A] published patent application destroys the secrecy of its contents for trade secret purposes[.]" *Tewari De-Ox Sys. Inc. v. Mountain States/Rosen, LLC*, 637 F.3d 604, 612 (5th Cir. 2011). The decision whether to seek a patent or maintain a trade secret protection is "an either/or choice." *Id.* (citing *Luccous v. J.C. Kinley Co.*, 376 S.W.2d 336 (Tex. 1964) ("[A trade secret claim] is totally incompatible with the election to surrender the protection of secrecy in return for a patent.")).

[18] When pressed at the evidentiary hearing, Stemtech could point to no evidence showing that Drapeau had relied on Stemtech trade secrets in formulating Cerule's products.

distributor network and vendors, the location of its most viable markets, its marketing and financial strategy, and its business plans—to compete. The issues concerning distributors and vendors have already been addressed. Stemtech provides no evidence beyond speculation that might support an inference that Defendants are misappropriating the other information. To the extent Stemtech alleges that Cerule is copying its multi-level marketing business structure, Drapeau has testified that Cerule is his fourth similar multi-level marketing endeavor. (Drapeau Dep., Dkt. 49-4, at 35:24–36:7). The similarity of business structure does not itself establish a trade secret violation, but that is all that Stemtech has demonstrated.

Stemtech has not sufficiently supported its allegations that Cerule's concededly similar business structure and products are the result of Drapeau's misappropriation rather than information permissibly obtained. It may well be that Stemtech has viable misappropriation claims. On the record currently before the Court, however, Stemtech has not shown a substantial likelihood of success on the claims it has pressed in its Application for Preliminary Injunction.

## III.   Tortious Interference with Contract

The final claim Stemtech urges in its Application for Preliminary Injunction is for tortious interference with contract, asserted against Drapeau and Cerule.

To maintain a tortious interference claim under Texas law, the plaintiff must show that: (1) a valid contract exists; (2) that defendant willfully and intentionally interfered with that contract; (3) the defendant's interference proximately caused plaintiff's injury; and (4) plaintiff suffered actual damage or loss. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 207 (Tex. 2002). Not all conduct that interferes with contracts can support liability. "Efforts to induce someone to exercise their rights to dissolve a contract do not constitute tortious interference of contract [if] the efforts are justified." *Kadco Contract v. Dow Chemical Co.*, 198 F.3d 241 (5th Cir. 1999) (per curiam). "Efforts are justified if (1) the relationship concerns a matter of competition between the actor and the other (2) the actor

does not employ wrongful means (3) his action does not create or continue unlawful restraint of trade and (4) his purpose is at least in part to advance his interest in competing with the other." *Id.*

In its Application for Preliminary Injunction, Stemtech mentions contracts "with its suppliers, employees, credit card processors, banks, customers, and distributors." (Appl. Prelim. Inj., Dkt. 29, at 15). The remaining discussion focuses only on Defendants' interference respecting Stemtech's distributors and suppliers. In its Reply, Stemtech again primarily discusses the interference with its distributor contracts. It adds only that Defendants have filed an affidavit in this litigation by a former Stemtech executive which discloses Stemtech's confidential information. Stemtech argues that this, too, is tortious interference with the executive's non-disclosure agreement. At the hearing on Plaintiff's Application, Stemtech clarified that the basis of its allegations are that Defendants (1) encouraged distributors to breach by selling competing products; (2) encouraged distributors to breach by soliciting their downline to sell competing products and/or leave Stemtech for Cerule; and (3) encouraged Drapeau, Lester, and Tashjian to breach their non-disclosure agreements.

One problem with Stemtech's tortious interference claims concerning its distributors is that the bulk of the conduct it complains of goes to the heart of the competitive justification. Drapeau's discussions with Stemtech distributors concern a matter of competition between Cerule and Stemtech, do not unlawfully restrain trade, and further Defendants' competitive interest. Further, Stemtech has not shown this conduct to be otherwise wrongful.[19] As this sort of conduct does not give rise to tort liability, it undermines Plaintiff's likelihood of success on these claims.

A second problem is that Stemtech has not established that Defendants' conduct has proximately caused its actual damages. Though Plaintiff has produced a chart showing a decline in

---

[19] At the hearing on Plaintiff's Application for Preliminary Injunction, Plaintiff's counsel conceded that Drapeau's own solicitation of Stemtech distributors would not in itself be wrongful unless he were using Stemtech's confidential information to do so. They have produced no evidence beyond speculation that he has used such confidential information with any particular Stemtech distributors.

sales in certain markets, no evidence in the record establishes that this is due to Defendants' wrongful interference. As Defendants have pointed out, Stemtech ceased use of AFA—previously a key product—just before the decline in sales. Defendants have also shown that Carter announced to staff that Drapeau had left the company and was starting a competing venture. These events might destabilize the company and cause a reduction in sales and the number of distributors independently of any wrongful conduct by Defendants. Indeed, according to the chart shown by Stemtech, sales had started to decline months before Cerule began to sell its competing products. Though it is *plausible* that the decline in sales is attributable to Defendants' interference, Plaintiff is not here defending a motion to dismiss and is not entitled to favorable inferences. Stemtech must carry its burden of establishing its entitlement to relief, and it has not done so.

As for Stemtech's allegations concerning the disclosure of confidential information in this lawsuit, Stemtech has again failed to show that the disclosure has caused any actual damages. In any case, the Court is not convinced that the equities favor hamstringing by injunction Defendants' ability to raise relevant defenses in this action. In fact, under Texas law as well as in federal courts, the protections afforded to trade secrets and other confidential information can give way when the information is relevant and necessary to a litigant's case. *In re Cont'l Gen. Tire, Inc.*, 979 S.W.2d 609, 612 (Tex. 1998). This policy privileging fair and full adjudication over confidentiality is also evident in a lawyer's ability to disclose information otherwise protected by attorney-client privilege when necessary to defend herself against a client's claims. *See United States v. Ballard*, 779 F.2d 287, 291 (5th Cir. 1986).[20]

---

[20] This is by no means an invitation for the parties to disregard the other's confidentiality rights. If it is necessary to disclose confidential information to the Court in support of a claim or defense, the parties are encouraged to work together to ensure the information remains protected from further disclosure. Procedures for filing under seal and for seeking a protective order are found in the Court's Local Rules.

Turning now to the arguments raised in the briefing only, Stemtech's allegations concerning Defendants' interference with its suppliers span a single sentence. (See Appl. Prelim. Inj. 15 ("Further, Drapeau is targeting Stemtech's suppliers to break their contracts in favor of Cerule.")). These allegations again concern Drapeau's competition—conduct that does not typically support tort liability.  Further, Stemtech has not demonstrated that Drapeau's activities have caused injury. Stemtech has only identified two or three suppliers that were allegedly the target of Defendants' interference. The record shows that Stemtech owes these suppliers money, and any disruption of business relationships could just as likely stem from that as from the actions of Defendants.

The allegations concerning Stemtech's credit card processors and banks receive absolutely no explanation in Stemtech's briefing and were not addressed at the hearing. Gleaning from the record, the issue becomes clearer. Stemtech alleges that Defendant Newman, CEO of Cerule, called Stemtech's bank and informed the bank that Stemtech owed Cerule money and that Cerule would no longer supply Stemtech with its key product which would put Stemtech out of business. The bank thereafter raised the interest rates on Stemtech's loans. Carter also alleges that someone associated with Defendants called the processor and informed the processor of the money Stemtech owes as a judgment creditor. The credit card processor thereafter informed Stemtech that it would place a hold on Stemtech's credit card income until it had built up a reserve of $300,000.

Stemtech has not shown that the interest rate increased was proximately caused by Defendants' interference. The record indicates that the rate increase was part of a loan renegotiation requested by Stemtech to lower its monthly payments. (Carter Dep., Dkt. 49-3, 117:6–120:9). Stemtech's allegations concerning its credit card processor are based solely on speculation. (*Id.* 122:2–124:25).[21]

---

[21] Carter conceded that a lawyer for a judgment creditor, not Defendants, contacted the credit card processor. He nonetheless insists that either Defendant Newman or non-party Jonathan Lester must have revealed the identity of the credit card processor to that lawyer. When asked the basis for his

Stemtech has failed to show a substantial likelihood of success on the merits of its tortious interference claims because its primary allegations concern conduct that typically does not support tort liability. For those and all other claims, Stemtech has not established causation. Accordingly, these claims provide no basis for a preliminary injunction.

## IV.     Objections

Defendants object to evidence contained in several of Stemtech's depositions as hearsay not within any exception or as speculation lacking foundation. (Dkts. 42, 62). Stemtech correctly points out that the Court may consider otherwise inadmissible evidence at the preliminary injunction stage. (Dkt. 51); *ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 682 (N.D. Tex. 2015) ("The law is well settled that . . . the court may rely upon otherwise inadmissible evidence when considering a preliminary injunction."). Defendants' objections are therefore overruled.

## CONCLUSION

For the reasons stated above, Stemtech has not shown a substantial likelihood of success on the merits of its claims. Accordingly, Stemtech's Application for Preliminary Injunction is **DENIED**.

**SIGNED** on December 27, 2016.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

---

belief, he stated that he "find[s] it strange" that the lawyer would be able to identify Stemtech's credit card processor out of thousands without inside information, and because Defendants and the lawyer for the judgment creditor have allegedly been in contact. There is no other evidence in the record to support Carter's claims.